Page number 21-1733. Vantage Commodities Financial Services I, LLC, for balance, versus Assured Risk Transfer PCC, LLC, et al. Mr. Gibbons for the balance, Mr. Dodge for the reinsurer appellees, Mr. St. Gino for the willies appellees. All right, Mr. Gibbons, good morning. Please proceed. You need to turn your mic on. I'm sorry, is it not on? Oh, you're unmuted. Okay. It is now. Okay. May it please the court, John Gibbons on behalf of Vantage. I would request two minutes for rebuttal. Vantage was established as a business to issue credit to energy companies so that they could purchase power and provide it to the public. Vantage protected itself on this credit business by purchasing a pull-to-share credit policy whereby if there was a loss sustained in the issues of credit, the pull-to-share credit policy would step in and pay the loss. It was, a pull-to-share policy is one in which the limits of liability are proportionally distributed amongst a number of companies. Those companies here are the appellees. Vantage contracted for, agreed to, and paid premiums, including $800,000 for this pull-to-share credit policy. This contractual agreement is documented in a number of different places, but most importantly, in two contractual binders that as the name connotes, bind the parties. Those are binders that were issued by Willis and signed by the Chief Operating Officer of Willis-Vermont. Vantage suffered a loss, and under the terms of the policy, enforced its rights to a $26 million judgment. It then turned to the quota share members who had proportionally agreed to pay the limits, and the quota share members disavowed the contractual agreement, and in an irony, sought to, for a credit insurance transaction, sought to turn the credit insurance policy into an uncreditworthy venture, after having collected and pocketed $800,000 in premiums for each of them. Vantage brought the enforcement action here, really, to take the parties who could be responsible to pay the loss and enforce the judgment. The credit binders, which state that the quota share members will pay on the same terms, conditions, and settlements as the credit policy, and the term settlements is what's most important because that doesn't mean a compromise, it means a resolution, and a judgment is a settlement. That promise was made and was the basis for Vantage paying premiums. Willis issued those binders, and there are two of them, issued before the policy, and then eight months into the policy, that was the promise that was being, was where the value was here. Otherwise, there'd be no value in purchasing the credit policy. Vantage sued for breach of contract against the quota share members, and the district court dismissed our well-fled expressed contract claim under the ruling that the binder didn't actually make any promise, it simply stated the terms by which the limits would be paid. That is a contract, and binders are, in fact, enforceable contracts. It was supported by $800,000 and the district court's dismissal of the expressed contract claim, which the architect of this entire program, a gentleman by the name of Paul Palmer, testified to that the quota share members agreed to, that dismissal of our expressed contract claim was error. There's nothing that forbids us from making an expressed contract claim. There's no immunity that is granted to the parties here. The quota share members, they can certainly be held liable for that. What is your- There's also- Counselor, what is the best single thing to which you can point as either the contents or the existence of an actual contract, or expressed or implied? Well, I think we would point to three things. Well, let me start with the best one. The binders, but I would also, the binders certainly, per the testimony of Mr. Palmer, contain the agreement, memorialize the agreement, but then we also have, supporting that Mr. Palmer's testimony, and we have the admissions of all of the quota share members, including their agreements that they would, they confirmed that they were taking $5 million of $22 million in limits issued by ART to what they call an EDF, which is the parent of Vantage. On summary judgment, the district court determined that the $800,000 of premiums didn't constitute consideration for this payment promise. That's error. The payment of premiums is recognized to be consideration for an agreement. The quota share members can try and dispute that, and that would be factually, and that's really what this disagreement boils down to, but to say that $800,000 in premiums isn't consideration just is contrary to the law of consideration. The district court also issued summary judgment when there were admittedly a myriad of fact disputes in the case. The appellees identified, I think, 150 to 100 paragraphs of fact disputes. They relied upon 454 paragraphs of statements of material fact. We disputed, I think, 125 of those paragraphs or more. The material fact disputes were robust in this case, and in fact, the appellees recognized that they were so robust that they moved to strike our facts, and the district court sat as the ultimate fact finder and dismissed our claim without acknowledging or addressing our evidence. With respect to Willis, the district court dismissed our negligent misrepresentation claim against Willis on a ground that Willis didn't even raise or argue for negligent misrepresentation because it doesn't apply. The economic loss doctrine was not argued for a negligent misrepresentation claim because that's a purely economic tort. Willis does not attempt to defend the district court's ruling. Instead, Willis asks this court to uphold the district court's ruling on an alternative ground by making this court the first fact finder. Well, the entire point of our appeal- Even, excuse me, I think I'm right. Even if you're right about that, that you didn't have notice, I think you have to show prejudice, don't you? Well, your honor, I think that certainly the fact that- And you don't say anything about prejudice in your brief. Well, we certainly say that the economic loss doctrine doesn't apply to negligent misrepresentation. I know, but you have to go on, and the court won't reverse that unless you can show prejudice, and you didn't indicate in the brief what sort of prejudice you suffered. So, I mean, you may have, my only point is it isn't in your brief. Well, I apologize. The pressure, the prejudice that we suffered is that an argument has now been raised by- You understand why I asked the question, right? I mean, I'm right. It's not in the brief, right? You agree with that, which means, did I miss it? Did I miss it? Well, I don't think we call it prejudice, your honor, but I think that the application of an argument that we weren't able to respond to that isn't applicable is the prejudice. I mean, I think that by saying that, in fact, the economic loss doctrine doesn't apply to negligent misrepresentation, and applying it and not letting us have that argument is the prejudice. So, we didn't call it prejudice, your honor, but we certainly addressed the point that that is prejudicial, not being able to address the fact that it doesn't apply. And it shouldn't have been entered as a basis to dismiss us and preclude us from the jury trial. I mean, more to the point, the entire argument about the economic loss doctrine, your honor, it doesn't properly apply the Witt and the Aguilar decisions, which find a special relationship for precisely this type of issue, where Willis, this type of issue, where Willis has made money in performing a business duty, and now having done so, allegedly, negligently, negligently or wrongly, according to the quota share members to then walk away and attempt to not have any liability to the extent that Vantage suffers loss, the DC Court of Appeals called that perverse and put the Witt and Aguilar special relationship exception to the economic loss doctrine into the law. And I see that my time is nearly up, so I would like to- All right, thank you. We'll give you a couple of minutes in reply. Mr. Dodge. Yes, good morning. May it please the court, I'm Rich Dodge on behalf of the Reinsurer Appellees, and I plan to address appellant's arguments for overturning the district court's well-reasoned and thorough decisions. If there is to be a theme for this appeal, and which we've heard in the opening, it would be that an appellant doesn't make it so by saying so. An appellant is required to identify actual facts that were improperly disregarded by the district judge or that were material. Vantage, our appellant here, is simply providing its own narrative, completely divorced from and unsupported by the facts on the record, and doing so does not reasonably create a material discreet effect. Wild allegations and hopeful legal conclusions do not warrant a jury trial. Indeed, the arrangement at the heart of this appeal is not unusual. It is a traditional insurance and reinsurance relationship. Vantage purchased insurance directly from ART, a captive insurer licensed in DC. ART separately contracted with the reinsurers for them to reinsure ART for any covered losses for which ART was liable. And these were very sophisticated parties, businesses working on these transactions. Agreements document these relationships. But what is highly unusual here is an insured pushing past its insurer to allege breaches of a direct contract and an implied contract against reinsurers without having had any contact with them whatsoever. The district court correctly granted reinsurers motion to dismiss and denied Vantage leave to amend and correctly granted summary judgment in favor of the reinsurers. So I'll go through these decisions. First, in its August, 2018 decision, the district court correctly recognized that because Vantage was not a party to the reinsurance agreements, Vantage could not claim the benefit of those terms. Then as the district court found in its November, 2018 decision, neither of the credit insurance binders issued by ART to Vantage were contracts between the reinsurers and Vantage. The district court was correct that the binders simply disclose the existence of the reinsurance policy, but that description alone does not create a contractual relationship with the reinsurer defendants. The district judge correctly concluded Vantage's alleged direct contract claim with reinsurers was not plausible. And in its March, 2021 decision, the district court correctly granted summary judgment for the reinsurers on Vantage's implied contract, promissory estoppel, and unjust enrichment claims. The undisputed facts show that prior to Vantage obtaining a money judgment against ART in 2016, Vantage and the reinsurers never corresponded directly or transacted any business. They had no contact whatsoever. Indeed, Vantage submitted its claim to ART reinsurer, its proof of loss of that claim to ART, and arbitrated its claim with ART. Vantage never contacted or involved the reinsurers, confirming Vantage's understanding that its remedy was solely with ART. Indeed, the reinsurance agreements do not contain any cut-through provision and expressly disclaim third-party rights. In addition to being unsupported by the evidence on the record, Vantage's position was nonsensical. Why would the reinsurers agree to a comprehensive reinsurance program for ART through which they had bargained for rights, including the right to deny coverage if ART failed to provide timely notice of a claim, and the right to arbitrate a dispute, only to voluntarily sacrifice those rights for the benefit of Vantage, a party with whom they had no relationship? Vantage's position is that the reinsurers essentially guaranteed any loss by Vantage, ignoring all written agreements to the contrary and in violation of D.C.'s statute of frauds. This highlights the lack of consideration. Mr. Dodge, what do you think the court should do with respect to the negligent misrepresentation claim that was resolved on the basis of an argued position? Yes, Your Honor. The negligent misrepresentation claim was not brought against the reinsurers. That is a claim. Thank you, I forgot that. Yeah, we'll deal with that later. Yeah, that's right, that's next. So, but I just wanna just point out this. This all highlights the lack of consideration for any implied contract as recognized by the district court. Vantage never paid anything directly to the reinsurers and never paid anything in extra. Support of an implied direct obligation running from the reinsurers to Vantage. The record soundly demonstrates that Willis and ART were not the reinsurer's agents. Undisputed testimony shows that ART and Willis-Vermont did not sign or send to Vantage the binders on behalf of the reinsurers and they in any event didn't have the authority to do so. And Vantage could not meet its burden to demonstrate that ART or Willis entities had any apparent authority to act on behalf of the reinsurers because there was none. Because the agency theory fails, Vantage's promissory estoppel and unjust enrichment claims fail. And just wanna point out, here for the first time, Vantage is calling I think the reinsurers these quota share insurers. Well, this is the first time it's not in their pleadings, it's not in their summary judgment briefs, it's nowhere to be found in the record that there's any sort of insurance that was offered on a quota share basis by these seven foreign-based reinsurers. And this goes again to the main theme of this is just saying so doesn't make it so. All right, Mr. Dodge, thank you. We'll hear from Mr. St. Gino's. And may it please the court. Good morning, your honors, may it please the court. Chris St. Gino's on behalf of the Willis Appellees. Your honors, my good friend, Mr. Dodge noted over a decade ago, multiple sophisticated entities negotiated multiple contracts to put together a structure that was set up to wholesale distribute and resale natural gas and electric. Willis was not one of those entities. Vantage was formed to provide credit facilities to that structure. As a risk offtake strategy, I'm sorry, Vantage bought an insurance policy from ART, a DC licensed special purpose captive insurance company. And ART went out and bought reinsurance from the seven appellee reinsurers. Again, Willis is not one of the insurers or reinsurers in this case. As my friend, Mr. Dodge also noted, there was a loss credit default. There was a fight between Vantage and ART over whether the policy, the ART policy covered that and Vantage prevailed. When ART went to go collect from the reinsurers, it turned out that Mr. Palmer, the CEO of ART and the individual Vantage calls the architect of the captive structure had not provided proper notice as required by the reinsurance treaties. And so the claim was denied. Now, ART or Vantage, as was their right, could have gone to an arbitration to challenge that decision. Indeed, the treaties had an E and O provision in them designed to address circumstances just like this. But instead, what Vantage did was it brought what the district court called were phantom contract claims, going around its insurer ART and suing the reinsurers directly. And Vantage also pursued an alternative route as the district court said, leaping over ART to sue Willis and claiming that if Mr. Palmer's error actually resulted in a lack of reinsurance, it was somehow all Willis' fault. That is, it tried to make Willis the ultimate insurer in this case. Now, Willis Rhee of North America Inc. was dismissed. There's no dispute. It's out. It was one of the three Willis appellees. The contract claims Vantage brought against Willis are out because there was no contract between those parties. They did not negotiate with each other and no compensation was paid from Vantage to ART. What's left are tort claims, Your Honor. I think there really is no dispute that the professional negligence and negligent undertaking claims go out because as the Court of Appeal in Washington, D.C. held, if it's a tort seeking economic injuries, as it is here, it's barred by the economic loss rule subject to one limited exception if there's a special relationship. The case my friend, Mr. Gibbons, cites Witt actually sets the bar for what is or is not a special relationship and they don't come close to meeting it here. For example, the Court of Appeal noted in Witt that the permit that was issued specifically directed the contractor to protect the hair salon. Over the course of two years, they had multiple conversations about protecting the hair salon. Here, Your Honor, Willis London had not one conversation or communication with Vantage. In fact, Vantage's CEO never even heard of Willis London. Willis Vermont sent one email noting a change of address when ART became ART it had been called Vantage Ray and one phone call that Mr. Hamilton, that the individual advantage who dealt with this really didn't recall. That doesn't come close to the standard. The court asked about negligent misrepresentation. I think- Look, how do you counsel, was there any DC authority on whether the economic loss rule applies to negligent misrepresentation? There is not, Your Honor. The two cases, in full transparency, there were no cases one way or the other. After Aguilar in 2014, no case directly addressed whether it does or does not apply to negligent misrepresentation in all circumstances. Vantage cited one case, the Holmes case, which referenced it in a footnote, had nothing to do with whether the economic loss rule applies. The district court didn't seem to acknowledge that. It seemed that the district court simply assumed some solentia that the economic loss rule would apply to negligent misrepresentation as well. Agreed, agreed, Your Honor. And there certainly are no cases that say it does not. So what do we do under those circumstances? I think, Your Honor, I think under the law of this court, this court is entitled to uphold a decision of the district court if there is any ground that was argued before the district court that would permit this court to do so. There is, Your Honor, I think, if you look through the brief we put in, as well as the statement of undisputed material facts, and we don't have hundreds, I think we had 30 or 35, and you separate disputed contentions from disputed facts, I think it becomes clear, Your Honor, that the sole document they rely on for the misrepresentation claim, this binder in the joint appendix at 2677, it has the name of the captive Vantage Re, now Art, on the top. It notes explicitly that Art is pleased to issue this binder of insurance, and the phrase they rely on in that document about reinsurance being ceded on the same terms and conditions was undisputably included by Mr. Palmer, the CEO of Art, because he had from the reinsurer's binders, reinsurance binders, cover notes, they're called there, that made clear it would be issued on the same terms and conditions, and, Your Honors, so it's not lost. It was. The reinsurance follows the fortunes, follows the terms and conditions of the captive. They both required notice. The only reason there is no reinsurance here, if there is none, is because while Vantage followed the requirement of giving Art notice of these claims, Art, Mr. Palmer, failed to follow the exact same condition that was in the reinsurance treaties. This structure worked the way it was supposed to. Unfortunately, Mr. Palmer's error just ruined the insurance. Now, what was clear at the district court, Your Honor, was there was no facts. There was no law in Washington, D.C. that would permit Vantage to recover from Willis-Vermont, the captive manager, or Willis-London, the reinsurance broker for the captive under D.C. law. I'm not sure where that's taking you. Are you saying that the negligent misrepresentation just simply wasn't made out, that there wasn't the misrepresentation? Under 552, the restatement, Judge Ginsburg, they need to show a statement was made by Willis. There was not. They need to show the statement was false. They did not. And they need to show that the maker showed no due diligence. That's not the case. There was proof, and there's proof in the record, that when Mr. Palmer made that statement in the binder, he had in his possession reinsurance, statements from the reinsurers that said same terms, conditions, and settlements. They did not make out that claim. Your Honor, if you send this back to the district court, I believe the outcome would be the same, but this court is permitted to affirm the district court on that basis, because it was briefed and argued below. Thank you very much, Your Honors. Unless you have any other questions, I'll submit on my papers. All right, thank you. Mr. Gibbons, you can take no more than two minutes. Turn on your mic. You're muted, Mr. Gibbons. I can't hear you. I'm, I was not, I didn't mute myself. That was the court, I think the court had muted me. Sorry about that. Your Honor, with respect to the term of the quota share members, actually that was referenced in us in the earliest responses to the motion to dismiss. We cited it in our brief, and they're included in the appendix. Moreover, in the reply brief, we noted that the quota share members didn't have a problem with that term at all, and it was used throughout the depositions. In fact, the fundamental fact dispute here isn't whether it's a quota share, it's a quota share. They say it's quota share reinsurance. We say it's quota share insurance. The architect of this structure, who was their business partner, Paul Palmer, testified that the quota share members were the real insurers. PCC had no assets. It was licensed to do business in the District of Columbia. So it couldn't sell insurance, except with the help of the quota share members who have assets, but aren't licensed in the District of Columbia. They got together and sold this product. Mr. Palmer testified thoroughly that the quota share members agreed to pay on the same terms, conditions, and settlements. That was then signed by the COO of Willis. These are insurance binders. The entire structure and the premiums were all paid for that promise. Without the quota share members, Mr. Palmer testified and others that this would be not insurance. In fact, it would be a fraud. Moreover, the quota share members admitted that they were directly insuring Vantage. And I quote, there is only one deal on the books, EDF, which was what they call Vantage, selling electricity to resellers. We covered the default of these resellers in case of non-payment. That's direct insurance. That's not re-insurance. There are a number of these quotes throughout that we've, this is throughout, and the district will recognize that the thrust of this case- Oh, I'm sorry, Your Honor. And Mr. Dodge, I wish you would quit shaking your head. Go ahead. Thank you, Your Honor. I'm sorry, I was not looking at the clock. All right, Madam Clerk, if you'd close court.
judges: Henderson, Tatel, Ginsburg